DISTRICT LODGE NO. 71 OF the INTERNATIONAL ASSOCIATION OF MACHINISTS, Plaintiff,

v.

BENDIX CORPORATION, KANSAS CITY DIVISION, Defendant.

Civ. A. No. 13368–4.

United States District Court
W. D. Missouri, W. D.

July 5, 1963.

John J. Manning and Robert S. Fousek, Kansas City, Mo., for plaintiff.

Watson, Ess, Marshall & Enggas, Kansas City, Mo., for defendant.

BECKER, District Judge.

In this action plaintiff labor union, unsuccessful in a grievance arbitration pro-

ceeding, seeks to set aside the arbitrator's award because of alleged procedural irregularities.

The defendant's motion to dismiss on the grounds that (1) this Court lacked jurisdiction of the subject matter, and (2) that the complaint failed to state a claim for relief, has previously been overruled by an order of this Court filed August 30, 1962.

### STIPULATION OF FACTS

The facts which were agreed upon in the stipulation filed herein on May 21, 1962, and which are accepted by both parties and the Court are as follows:

"1. That on or about November 3, 1960, plaintiff and defendant entered into a Collective Bargaining Contract (a true copy of which is attached to the complaint in this cause and marked Exhibit 'A') and that said Contract expires on October 31, 1963.

"2. That said Collective Bargaining Contract contains, among others, the following provisions:

"(a) 'Step 5 (Part 1)—The Union and the Company shall agree upon three (3) alternate arbitrators, one of whom shall be selected for any scheduled hearing. They shall continue to serve for the term of the Agreement from the date of appointment provided they continue to be acceptable to both parties. Should either party wish to terminate the services of an arbitrator, the party shall notify the other party in writing. Such termination shall take effect thirty (30) days from the date of the written notice. If the parties are unable to agree upon the arbitrators within thirty (30) working days from the date of this Agreement, the Federal Mediation and Conciliation Service shall be requested to submit seven (7) names, from which list the arbitrators shall be selected. The Company and the Union shall alternately strike out two (2) names each and the last remaining names shall be the three (3) alternate arbitrators. These arbitrators must have received the necessary Atomic Energy Commission clearance. When the parties have agreed on an arbitrator for a particular hearing, he shall be notified by the parties of the time and place for the hearing, which time and place shall be mutually agreed to.'

"(b) 'Step 5 (Part 2)—The arbitrator shall have no power to add to, subtract from or modify any of the terms of this Agreement, or any other terms made supplemental hereto, or to arbitrate any matter not specifically provided for by this Agreement or to arbitrate any new provision into this Agreement. The arbitrator shall have no power to establish new or change the existing wage rate structure or establish new or change existing job content or to decide any matter pertaining to production standards. The arbitrator shall render a decision, in writing, to both parties within fifteen (15) days after the closing of the hearing. The hearing shall be considered closed when the transcript of the proceedings is received by the arbitrator. There shall be no appeal from the arbitrator's decision, which shall be final and binding upon the Company, the Union and the employees. Costs pertaining to the arbitration proceedings, including the cost of the stenographic record and any transcripts thereof, shall be shared equally by the Union and the Company.'

"3. That said Collective Bargaining Contract contains no provision which states that an arbitration award rendered after fifteen days from the receipt of the transcript by the Arbitrator shall be either void or valid.

"4. That within the thirty day period following the execution of the aforesaid Collective Bargaining Contract the parties, pursuant to the provisions thereof, appointed Carl R. Schedler as one of the three Arbitrators to serve for the three-year term of said Contract subject to the provisions of Step 5, Part I of said Contract. That the said Carl R. Schedler accepted such appointment and subsequently served as an Arbitrator under said Contract and that he continues to serve as an Arbitrator under said Contract.

"5. That on or about February 10, 1961, the defendant discharged one of its employees, to wit, Leonard L. Meads.

"6. That Meads filed a grievance protesting his discharge, which grievance was designated as No. 8219.

"7. That subsequent to said discharge plaintiff requested arbitration pursuant to the provisions of the aforesaid Collective Bargaining Contract.

"8. That on March 16, 1961, an arbitration hearing was held before Carl R. Schedler and that one of the grievances arbitrated on that date was grievance No. 8219.

"9. That on March 31, 1961, copies of the transcript of the aforesaid arbitration hearing were delivered to the plaintiff and either delivered or placed in the United States Mail to the defendant and that on or about the same date the original copy of the transcript was placed in the United States Mails by the Court Reporter, addressed to Carl L. Schedler.

"10. That on a date not later than April 13, 1961, plaintiff and defendant each received from Carl R. Schedler identical copies of a document entitled 'opinion and award', which 'opinion and award' related to grievance No. 8219 and was dated April 5, 1961. A true and exact copy of said document is attached hereto and marked Exhibit 'A'.[1]

"11. That under date of April 13, 1961, defendant's Director of In-

1. Exhibit "A" reads as follows:

"*GRIEVANCE NO. 8219—Discharge of Leonard L. Meads*
"ISSUE

"Was Meads discharged for good and sufficient cause?

"OPINION and AWARD

"Meads, a Turret and Engine Lathe Operator, was employed by the Company continuously for more than 10 years until his discharge on February 10, 1961. The Company asserts that its understanding of an incident which occurred exactly two months previously justifies the discharge.

"On December 10, 1960, Meads was taken into custody by Sgt. Miller of the Kansas City Police Department on the complaint of Miller's wife, who charged Meads in effect with molestation or indecent exposure in a department store. Meads has consistently denied that the alleged act ever occurred. Because the contract between the Union and Company provides that only employees shall be witnesses in grievance proceedings, neither Sgt. Miller nor his wife testified before me. However, testimony was given by a Company witness who, upon hearing a rumor that Meads had been arrested, made an investigation. This witness, James Fernan, in charge of security operations for the Company, explained the manner and results of his investigation in a way which gives rise to a strong implication that Sgt. Miller and his wife would have corroborated the admittedly hearsay evidence. The Company's position appears to be that, even if Meads was not convicted of the alleged offense, (and it seems that the criminal case against him was ultimately dismissed without a finding of either guilty or innocent), nevertheless there is sufficient basis for a reasonable belief that the offense did occur and that it would be detrimental to working conditions of other employees to retain Meads. The Union contends to the contrary, that the Company could not have a reasonable basis for believing Meads guilty since he was not proven guilty; and even if he had been convicted, the offense occurred away from Company premises, was apparently not publicized in any way so as to involve the Company, and in fact bore no relation to Meads' employment.

"While recognizing that the parties have limited the witnesses who may testify in grievances, which makes it increas-

dustrial Relations, Mr. J. A. Pope, wrote a letter to Carl R. Schedler with reference to the document entitled 'opinion and award', dated April 5, 1961, and that a copy of said letter was sent by United States Mail to Mr. Don L. Black, business representative of plaintiff. A true and exact copy of said letter is attached hereto and marked Exhibit 'B'.[2]

"12. That on April 28, 1961, at approximately 12:00 noon, Eastern Standard Time, Arbitrator Carl R.

---

ingly difficult to ascertain the facts, I do not think the limitation should in this case operate to give a preponderance to the hearsay evidence on which the Company's argument rests. On the other hand, my observation of Meads as a witness compels me to conclude that he was something less than candid and was obviously strongly motivated by his desire to 'win' his case. Should I find, as I am not prepared to do at present, that Meads actually committed the act alleged, there would be the further question as to whether this single incident, which would be apparently the only offense in 10 years of otherwise satisfactory employment and which occurred away from the plant, was such improper conduct as to support the Company's action. In this connection, it is generally recognized that, although the offense alleged here does not usually carry a heavy penalty in the eyes of the law, it is one to which a severe social stigma attaches and which makes the offender an undesirable associate, especially in a plant with a large number of female employees. In view of the additional factor that all employees of the Company are engaged in work requiring the highest security clearance, I believe that the case, admittedly an unusual one, calls for further proceedings. I therefore will hold a final disposition in this matter in abeyance, and order as follows: I direct that the Company continue to process, or re-activate for processing, the February, 1961, Personnel Security Questionnaire executed by Meads. Upon receipt from the Atomic Energy Commission of its report with respect to the questionnaire, the Union and the Company shall attempt to resolve this grievance. If no resolution is achieved, the matter shall be returned to me for a final award.

"AWARD

"Grievance No. 8219 shall be disposed of in accordance with the above opinion.

"April 5, 1961    /s/ Carl R. Schedler

"Carl R. Schedler, Arbitrator."

2. The message in Exhibit "B" reads as follows:

"Re: Grievance No. 8219—

Discharge of Leonard L. Meads

"The Company finds it difficult to understand or comply with the arbiter's opin-

---

ion in the subject case. Our difficulty stems from the apparent lack of understanding on the part of the arbiter concerning the relationship of Bendix as a Prime Contractor and the Atomic Energy Commission as the contracting governmental agency.

"Bendix secures from applicants for employment completed personnel security questionnaires. These are forwarded to the AEC for processing. In due course the Company is told that the employee has received a Q clearance and that access to restricted data is permissible. On rare occasions the Company is told that an employee will not receive a Q clearance and that the services of the employee should be terminated. We do not have access to AEC reports nor is it our prerogative to question the action of the Commission in granting or withholding clearance. We have never used security as an excuse for the execution of sound management principles.

"Periodically, every few years, we are asked to have cleared employees execute new, up-to-date, personnel security questionnaires. The clearance is not suspended during this process and we rarely, if ever, receive any subsequent communication from the AEC after these PSQ's are submitted. It is assumed that if the new PSQ or supplemental investigation should develop something pertinent bearing on the individual's clearance status, we would be advised of any final action, which notice might come in a period from three months up to a year or more.

"When an employee is terminated for any reason and the AEC is notified of the termination, all processing for security clearance is discontinued, since the AEC assumes, and rightfully so, that the Company is no longer interested in the individual.

"Your suggestion that the Company continue to process or to reactivate for processing the February, 1961, personnel security questionnaire executed by Meads is, we believe, irrelevant insofar as the basic issues are concerned. True, some testimony was elicited with respect to the falsification of the PSQ by Meads which bears upon the credence to be accorded his testimony, but this is really a side

Schedler sent identical telegrams from Washington, D. C. to the parties, advising that he was issuing a 'supplemental award today finding discharge was for good and sufficient cause'. A true and exact copy of the telegram sent to the defendant is attached hereto and marked Exhibit 'C'.[3]

"13. That Carl R. Schedler rendered a 'supplemental award' in grievance No. 8219, which award was dated April 28, 1961, and that identical copies of said 'supplemental award' were sent in due course by United States Mail to the parties and were received by them on May 1, 1961. A true and exact copy of said 'supplemental award' is attached hereto and marked Exhibit 'D'.[4]

"14. That at no time prior to the receipt by plaintiff of said 'supplemental award' dated April 28, 1961, did plaintiff or any of its representatives notify either the Arbitrator (Carl R. Schedler) or the defendant that it objected to and did not accept the award of the Arbitrator because not rendered within fifteen days from the date the transcript was received by the Arbitrator, or for any other reason; that the first time the Union or any of its representatives notified either the Arbitrator or the defendant of its objection to the timeliness of the 'supplemental award' of the Arbitrator

issue which has nothing to do with his desirability as an employee. Bendix took the action in the Meads case based solely upon his alleged conduct in the Blue Ridge Shopping Center on December 10, 1960, which resulted in his arrest and detention by the authorities. We would have taken the same action in the absence of any personnel security questionnaire or had he been completely truthful in the execution of the questionnaire. In other words, matters dealing with the questionnaire are matters of interest to the AEC but of only incidental interest to Bendix.

"Further, the arbiter's suggestion that the Company and the Union attempt to resolve the grievance is placing the parties back where the arbiter found them. If we had been able to resolve the grievance, admittedly we would not have found ourselves in arbitration. Therefore the Company requests that the arbiter rule on the merits of the case as to whether or not Meads was discharged for good and sufficient cause, without regard to any matters connected with the personnel security questionnaire."

3. The message in Exhibit "C" reads as follows:
   "ABSENCE FROM OFFICE HAS DELAYED ANSWERING COMPANY APRIL 13TH LETTER STATING IT IS UNABLE TO OBTAIN SECURITY INFORMATION REQUESTED REGARDING GRIEVANCE #8219 THEREFOR WILL ISSUE SUPPLEMENTAL AWARD TODAY FINDING DISCHARGE WAS FOR GOOD AND SUFFICIENT CAUSE."

4. Exhibit "D" reads as follows:
   "In the Matter of Arbitration Between:

   THE BENDIX CORPORATION
   Kansas City Division
   and
   INTERNATIONAL ASSOCIATION OF MACHINISTS, District Lodge No. 71

   SUPPLEMENTAL AWARD
   Grievance No. 8219

   "On April 5, 1961, I issued a tentative award in Grievance No. 8219, stating I would withhold final disposition pending the Company's obtaining additional security information from the Atomic Energy Commission. In a letter dated April 13, 1961, the Company stated that it was unable to obtain the information requested.

   "On the whole record before me, it is hereby finally awarded that Grievance No. 8219 is denied, and the discharge of Leonard L. Meads was for good and sufficient cause.

   "/s/ Carl R. Schedler
   _____
   "Carl R. Schedler, Arbitrator

   "April 28, 1961"

was subsequent to the date that said 'supplemental award' was received by the plaintiff.

"15. That at no time did the plaintiff and the defendant agree to extend the period of time set forth in the Collective Bargaining Contract for the rendering of arbitration awards."

## PLEADINGS

The allegations of the complaint are that the action of the arbitrator as set forth in the stipulation of facts hereinabove exceeded the scope of the arbitrator's authority:

"* * * for he had lost jurisdiction over the subject matter and the said award is wholly void. The arbitrator, in giving consideration to the additional evidence set forth in the letter sent to him by the defendant [Exhibit "B," footnote 2, supra] considered material outside of the record and denied to the plaintiff the right to rebut the evidence and constituted a denial of due process of law."

The defendant denies that the arbitrator considered material outside the record and denies that the arbitrator exceeded or lost his jurisdiction.

■ The plaintiff's allegation that the arbitrator considered material outside the record in reaching his supplemental and final award, i. e., Exhibit "B," Note 2, supra, is unsupported by the record. In the tentative award, Exhibit "A," Note 1, supra, the arbitrator requested that the Company procure further evidence in the form of the "Personnel Security Questionnaire" which had been mentioned at the hearing. This questionnaire was not secured and submitted because the questionnaire was in the hands of the Atomic Energy Commission for security clearance purposes.[5] The Company letter in response to this request, Exhibit "B," Note 2, supra, is but a lengthy explanation for, and justification of, the Company's inability to secure the requested document. It adds nothing to the evidence adduced at the hearing, and, in any event, there is nothing in the record to indicate that anything in the letter was considered by the arbitrator in reaching his supplemental and final award.[6]

Plaintiff's principal contention is that the arbitrator exceeded his jurisdiction by filing the supplemental and final award after the claimed expiration of the time limit imposed by the Collective Bargaining Contract.

The Contract specifies that:

"The arbitrator shall render a decision in writing, to both parties within fifteen (15) days after the closing of the hearing. The hearing shall be considered closed when the transcript of the proceedings is received by the arbitrator."

In this case the transcript of the proceedings was mailed to the arbitrator on or about March 31, 1961. It is presumed to have been received within a few days thereafter. The supplemental and final award was not rendered until April 28, 1961, well beyond 15 days after presumed receipt of the transcript.

As agreed in paragraph 14 of the Stipulation of Facts hereinabove set forth, at no time prior to the supplemental and final award, which was ad-

---

5. Every employee who works at the Kansas City Division of Bendix Corporation must have a "Q" clearance from the Atomic Energy Commission. Transcript pp. 69–70. Page 74 of the Collective Bargaining Agreement states:
   "Security Requirements
   "The Union agrees that where Government security regulations are placed upon the Company, such regulations will govern the acceptance or rejection of an employee for work coming under those regulations. The union agrees that it will not file a grievance where the Company has removed from the payroll any employee who has not received a security clearance or whose security clearance has been revoked. This provision does not affect any rights or remedies available through Atomic Energy Commission procedures."

6. Bendix-Westinghouse Automotive Air Brake Co., 36 L.A. 724, 1. c. 725.

verse to its interests, did the plaintiff notify either the arbitrator or the defendant that it objected to the arbitrator's announced intention to enter a final award if the grievance was not resolved by the parties upon receipt of the Personnel Security Questionnaire from the Atomic Energy Commission. Indeed, there is nothing in the record to indicate that the plaintiff made any objection to anyone prior to the filing of the complaint herein on June 21, 1961.

■ The plaintiff knew or should have known that such final award would not be entered within fifteen days after receipt of the transcript; it nevertheless failed to make a timely objection. In these circumstances silence constituted a waiver of any objection on that basis.[7] An annotation on the general problem of an arbitrator's failure to make an award within the specified time limits appears in 154 A.L.R. at 1392. It is stated therein at page 1406 that "It seems to be absolutely essential, in order to preserve one's rights, to protest against the continuance of the arbitration proceedings after the stipulated time has elapsed. Mere non-participation in the continued proceedings will not be considered as sufficient." This is a reasonable rule which will be applied in this case.

Further, the practice that has developed between the parties and the arbitrator with respect to the time limit expressed in the Contract must be considered. In this connection a three-volume transcript of the proceedings before this arbitrator on March 16 and 17, 1961, includes a record of the hearing of the Meads grievance and other grievances between the parties to this action. By an Additional Stipulation of Facts filed October 29, 1962, the parties have agreed that this transcript is a true and correct record of those proceedings.

At pages 144 and 145 of the third volume of proceedings the following discussion is reported:

"THE ARBITRATOR: Well, as usual, I enjoyed very much being with you, and I am aware of the fact that on Page 22 of your contract my decisions are due within 15 days after receipt of the transcript. I have not returned the other decisions because I haven't completed them, and I ask your indulgence to give me a little more time to complete them, and, if necessary, I'd like to have an understanding as to waiver of the 15-day rule so I won't be held in contempt in the event I'm over the 15 days in the other group.

"These, I'm sure I'll have out within the rule, but on previous cases I have suffered the pressure of a lot of postponed cases all wanting to be heard at the same time.

"Is that agreeable, that I take a few more days to finish those other cases?

"MR. POPE: I'm sure it is.

"THE ARBITRATOR: Is it all right with the Union?

"MR. BLACK: No objection. The Union looked for a while for the decision and award, and then we finally started looking for a letter asking for the time. Certainly, we do not object.

"THE ARBITRATOR: I was aware of the 15-day limitation, but I thought you'd let me know by calling me or writing me.

"Thank you very much."

While the Meads grievance was not expressly mentioned in this exchange between the parties and the arbitrator, the language was sufficiently broad to indicate that, as a general course of dealing,

---

7. See Bendix-Westinghouse Automotive Air Brake Co., 36 L.A. 724, l. c. 729–31, where it is stated at pages 729–30 that: "It [waiver] is essentially a principle based upon the concept of fairness which denies to a party the privilege of sitting back, waiting and withholding the assertion of its rights until it finds out whether it will get a greater advantage by not pressing its claim."

the strict time limits adopted in the contract have not been applied in practice, and the parties have not as a matter of practice held the arbitrator to those limits.[8]

It is not necessary to hold that the receipt by the arbitrator of a transcript of a hearing held open for the reception of further evidence, which evidence was not secured, was a receipt of the transcript within the meaning of the contract provision for arbitration. Such a holding would be a highly technical one. Arbitration is of course not only designed to secure speed in decision, but also to avoid technicalities. The action of the arbitrator might well be sustained on the theory that the transcript was not submitted until it became known that the additional evidence requested was not to be offered.

In the Lincoln Mills decision [9] the federal courts were directed to fashion a new body of federal law to govern suits under section 301(a) of the Labor Management Relations Act. This body of law should not be marked by technical rules not affecting the substance of the decision.

A party to a grievance who is charged with knowledge that an arbitrator's power to decide may have expired should not be permitted to await the decision and then to void the decision if unfavorable.

## CONCLUSIONS OF LAW

For these reasons, and for the further reason that the plaintiff has not alleged, nor does it appear from the record, that the delay in question was material, unreasonable, unjustified or prejudicial,[10] it is concluded that the final award of the arbitrator on the Meads grievance is valid and binding. It is therefore

Ordered that counsel for the defendant herein prepare and submit on notice, pursuant to Rule 6(c) of the Rules of this Court, a draft of an order of judgment embodying the decision herein.

---

8. See Ironrite, Inc., 28 L.A. 398, 1. c. 400; Standard-Thomson Corp., 26 L.A. 633, 1. c. 634; United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 1. c. 580, 80 S.Ct. 1347, 1. c. 1351, 4 L.Ed.2d 1409.

9. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 1. c. 456, 77 S.Ct. 912, 1. c. 917, 1 L.Ed.2d 972.

10. See United States Pipe & Foundry Co., 28 L.A. 775, 1. c. 777.